IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 23-cv-02682-PAB-NRN

GAIL HARRISON,

     Plaintiff,

v.

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,

     Defendant.

---

## ORDER

---

This matter comes before the Court on State Farm's Opposed Motion for Partial Summary Judgment on Plaintiff's First Claim and Summary Judgment on Plaintiff's Second Claim and Third Claim for Relief [Docket No. 55]. Plaintiff Gail Harrison filed a response to the motion for summary judgment, Docket No. 62. Defendant State Farm Mutual Automobile Insurance Company ("State Farm") filed a reply regarding the motion for summary judgment, Docket No. 66. The Court has jurisdiction pursuant to 28 U.S.C. § 1332.

### I. UNDISPUTED FACTS FOR SUMMARY JUDGMENT[1]

On April 15, 2021, Ms. Harrison was involved in a motor vehicle accident with David Palma. Docket No. 55 at 3, ¶ 1. Mr. Palma was insured by The General with bodily injury liability limits of $25,000.00. *Id.*, ¶ 2. At the time of the accident, Ronnie Spotts, the owner of the vehicle that Ms. Harrison was driving, was the named insured

---

[1] The following facts are undisputed unless otherwise noted.

under four insurance policies issued by State Farm.  *Id.*, ¶ 3.  Each of these State Farm

policies provided underinsured motorist ("UIM") coverage with limits of $100,000 per

person.  *Id.*

### A. <u>Mr. Spotts's and Ms. Harrison's Relationship</u>

Ms. Harrison and Mr. Spotts have cohabitated for over 20 years.  Docket No. 62

at 4, ¶ 1.  Ms. Harrison and Mr. Spotts testified in this case that they believe they are

married.  *Id.* at 5, ¶ 2.[2]  Mr. Spotts does not charge rent for Ms. Harrison to reside in the

home they share.  *Id.*, ¶ 5.  Ms. Harrison and Mr. Spotts share responsibility for caring

for a dog.  *Id.*, ¶ 7.  Mr. Spotts provides the vehicles and insurance for the vehicles that

he and Ms. Harrison both drive.  *Id.*, ¶ 4.  Ms. Harrison pays for the television, internet,

and other subscriptions that they use for entertainment within their home.  *Id.*, ¶ 6.  Ms.

Harrison provides groceries and cooks for both herself and Mr. Spotts.  *Id.*, ¶ 3.

Mr. Spotts guessed that he married Ms. Harrison in 1991, but he could not recall

the day or the month.  Docket No. 55 at 4, ¶ 14.[3]  There was never a formal ceremony,

either in a church or with the government, and Mr. Spotts did not give Ms. Harrison a

ring.  *Id.*, ¶ 13.  Ms. Harrison and Mr. Spotts do not celebrate any anniversary.  *Id.*, ¶ 15.

Ms. Harrison and Mr. Spotts have never owned any property or real estate together.

---

[2] State Farm states that it is "[u]ndisputed that Plaintiff and Ronnie Spotts
testified that they were 'common law' or in 'a common law marriage,'" but that this fact is
"[d]enied to the extent Plaintiff testified she was married only once and that was to
James Presley."  Docket No. 66 at 2, ¶ 2 (adopting State Farm's response at Docket
No. 66 at 2, ¶ 4).  The purported fact does not involve any issues related to Ms.
Harrison's prior marriage.  The Court therefore finds the objection to be non-responsive
and deems this fact to be admitted.

[3] Ms. Harrison denies this fact, stating that "Mr. Spotts testified that he believed
he has been married to Ms. Harrison since 1991."  Docket No. 62 at 3, ¶ 14.  It is not
clear to the Court what distinction Ms. Harrison is attempting to draw.  The Court deems
this fact to be admitted.

*Id.*, ¶ 11.  Ms. Harrison and Mr. Spotts have never owned any financial accounts, bank accounts, or loans together.  *Id.*, ¶ 12.  Ms. Harrison claims that she told one person that she was common law married.  *Id.*, ¶ 9.  Mr. Spotts has not told anyone that he is common law married, despite the fact that Mr. Spotts has two children with whom he keeps in contact.  *Id.*

Ms. Harrison and Mr. Spotts have never filed joint taxes.  *Id.* at 3, ¶ 5.  Mr. Spotts filed for bankruptcy in 1997 as single.  *Id.*, ¶ 6.  Ms. Harrison applied to Medicaid and Medicare as single.  *Id.*, ¶ 7.  Mr. Spotts applied to Medicare in 2008 as single.  *Id.*  Ms. Harrison and Mr. Spotts receive social security benefits as singles.  *Id.* at 4, ¶ 8.

On April 28, 2021, Ms. Harrison's attorney advised State Farm that Ms. Harrison was the spouse of Mr. Spotts.  *Id.* at 5, ¶ 18.  On June 1, 2021, State Farm advised Ms. Harrison's attorney that four policies were available in UIM coverage and provided the applicable declarations pages.  *Id.*, ¶ 21.[4]

**B.  Claim Adjustment Process**

On April 21, 2021, Ms. Harrison submitted a claim for UIM benefits with State Farm.  *Id.* at 4, ¶ 16.  On April 28, 2021, State Farm sent a letter to Ms. Harrison's attorney, acknowledging the letter of representation and requesting that Ms. Harrison return a completed Authorization for Release of Information ("ARI").  *Id.*, ¶ 17.  On May 19, 2021, Ms. Harrison's attorney requested consent to settle Ms. Harrison's claim

---

[4] Although the undisputed facts do not make this explicit, the four insurance policies held by Mr. Spotts and referenced at Docket No. 55 at 3, ¶ 3 are the same four insurance policies that State Farm initially believed applied to Ms. Harrison based on her attorney's representation that she and Mr. Spotts were married.  *See id.* at 5, ¶¶ 18, 21.

against Mr. Palma for $25,000.  *Id.* at 5, ¶ 19.  On May 25, 2021, State Farm consented

to Ms. Harrison's settlement with Mr. Palma's insurance company for $25,000.  *Id.*, ¶ 20.

On June 1, 2021, State Farm advised Ms. Harrison's attorney that four policies

provided UIM coverage and sent to him the applicable declarations pages.  *Id.*, ¶ 21.

On June 23, 2021, Ms. Harrison's attorney sent bills and records, and he requested that

State Farm pay the full value of its evaluation.  *Id.*, ¶ 22.  On July 7, 2021, State Farm

advised Ms. Harrison's attorney that it did not owe benefits at that time as the medical

expenses were below Mr. Palma's insurance policy's $25,000 limit.  *Id.*, ¶ 23.  State

Farm extended an offer of $708.65 to resolve plaintiff's claim.  *Id.*  On September 9,

2021, plaintiff claimed medical expenses of $35,193.82, provided a link to the bills and

records, and requested benefits owed within 30 days.  *Id.*, ¶ 24.  On September 20,

2021, State Farm advised Ms. Harrison's attorney that State Farm could not access the

documents through the link.  *Id.*, ¶ 25.  On September 28, 2021, Ms. Harrison's attorney

re-sent the September 8, 2021 letter with the corresponding documents.  *Id.*, ¶ 26.[5]

On October 22, 2021, Ms. Harrison's attorney provided plaintiff's signed ARI and

advised that Ms. Harrison was recommended for cervical injections and, potentially,

surgery, that she was continuing to get treatment, and that she requested benefits owed

at that time.  *Id.* at 6, ¶ 27.  On October 27, 2021, State Farm issued a payment of

$11,747.22 for Ms. Harrison's undisputed past medical expenses and extended an offer

of $31,747.22 to resolve Ms. Harrison's claim.  *Id.*, ¶ 28.  On November 1, 2021, Ms.

Harrison's attorney requested a breakdown of State Farm's evaluation within 30 days.

---

[5] The Court notes a discrepancy between whether the letter being re-sent was
originally sent on September 8, 2021 or September 9, 2021.  *Compare* Docket No. 55 at
5, ¶ 24, *with id.*, ¶ 26.  The distinction between the two dates, however, is not material.

*Id.*, ¶ 29.  On November 7, 2021, State Farm explained that the offer of $31,747.22

included past medical bills of $36,744.22, non-economic damages and

impairment/disfigurement of $20,000, minus the underlying liability limits of $25,000.

*Id.*, ¶ 30.[6]  On November 11, 2021, Ms. Harrison rejected State Farm's offer of

$31,747.22.  *Id.*, ¶ 31.[7]

On November 20, 2021, State Farm requested documentation for continued

treatment and/or supporting documentation for the potential surgery.  *Id.*, ¶ 32.  State

Farm also requested a demand with a dollar value.  *Id.*  On January 27, 2022, Ms.

Harrison's attorney provided past medical expenses of $55,403.12, a future surgical

estimate of $205,954.68, a neuropsychological evaluation of Ms. Harrison, and

requested benefits owed within 30 days.  *Id.*, ¶ 33.  On February 25, 2022, State Farm

sent a letter to Ms. Harrison's attorney, noting questions as to whether Ms. Harrison's

claimed concussion symptoms and future surgery were related to the car accident and

requesting prior records.  *Id.* at 6-7, ¶ 34.  In the alternative, State Farm stated that Ms.

Harrison could return the enclosed ARI and medical provider summary, including for

prior providers.  *Id.*  State Farm stated that, upon receipt of all records, a records review

or an independent medical examination ("IME") may be necessary.  *Id.*

---

[6] Ms. Harrison denies this fact, stating that, "State Farm evaluates as general
damages not specifically non-economic damages and impairment/disfigurement."
Docket No. 62 at 3, ¶ 30.  It is not clear to the Court what distinction Ms. Harrison is
attempting to draw.  The Court therefore deems this fact to be admitted.

[7] Ms. Harrison denies this fact, stating that the "correspondence in question was
not a denial of an offer, but merely a statement that the current evaluation is insufficient
to adequately compensate Ms. Harrison."  Docket No. 62 at 3, ¶ 31.  However, Ms.
Harrison does not deny that she refused to settle her claim for $31,747.22 and therefore
the Court deems this fact to be admitted.

On March 24, 2022, Ms. Harrison's attorney provided State Farm with the information for Ms. Harrison's primary care provider, Sara Brownlee, NP, at Denver Health's Lowry Family Health Center ("Denver Health"). *Id.* at 7, ¶ 35. Ms. Harrison's attorney requested that State Farm use the previously provided ARI to obtain the prior medical records, requested an updated evaluation, and requested benefits owed within 30 days. *Id.* On April 9, 2022, State Farm sent a request to Denver Health for Ms. Harrison's records from April 15, 2016 through the end of treatment. *Id.*, ¶ 36. On April 25, 2022, State Farm advised Ms. Harrison's attorney that it had not received any records yet. *Id.*, ¶ 37. If Ms. Harrison had the prior records in her possession, State Farm asked that they be provided. *Id.* State Farm stated that, without the prior records, its evaluation and offer remained unchanged. *Id.*

On May 9, 2022, Ms. Harrison's attorney requested an updated evaluation and benefits owed within 14 days. *Id.*, ¶ 38. On May 11, 2022, State Farm called Denver Health, but the office was closed. *Id.*, ¶ 39. State Farm faxed a request for records to Denver Health. *Id.*; Docket No. 55-6 at 3. On May 17, 2022, State Farm sent a letter to Ms. Harrison's attorney stating that the prior records had not yet been received and that State Farm needed those records. Docket No. 55 at 7, ¶ 40. State Farm asked that, if Ms. Harrison had the records in her possession, she send them to State Farm. *Id.* State Farm stated that, without the prior records, its evaluation and offer remained unchanged. *Id.*

On June 8, 2022, Ms. Harrison requested an update. *Id.*, ¶ 41. On June 13, 2022, State Farm sent a letter to Ms. Harrison's attorney stating that it still had not received any prior records and asked that, if Ms. Harrison had obtained any prior

records, she provide them.  *Id.* at 8, ¶ 42.  On June 17, 2022, State Farm called Denver

Health to request their specialized ARI, which was required by Denver Health in order to

obtain records.  *Id.*, ¶ 43.  On July 6, 2022, State Farm sent a letter to Ms. Harrison's

attorney requesting that Ms. Harrison complete Denver Health's ARI.  *Id.*, ¶ 44.

On August 15, 2022, Ms. Harrison claimed total economic damages of

$261,357.80, including past medical bills of $55,403.12 and a future surgery estimate of

$205,954.68.  *Id.*, ¶ 45.  The letter indicated that prior medical records from Denver

Health were enclosed.  *Id.*  Ms. Harrison requested payment within 30 days of any

benefits presently owed.  *Id.*  On August 22, 2022, State Farm sent a letter to Ms.

Harrison's attorney stating that the electronic media it received had no data.  *Id.*, ¶ 46.

State Farm said that, if Ms. Harrison would like to resubmit this information, she could

send it to the address included in the letter.  *Id.*  On September 30, 2022, Ms. Harrison's

attorney advised that he would send the prior records again.  *Id.*, ¶ 47.  On October 7,

2022, State Farm received the records.  *Id.*, ¶ 48.

On November 2, 2022, State Farm responded to counsel's letter dated August

15, 2022.  *Id.*, ¶ 49.  State Farm requested the missing surgeon's quote, confirmation of

any ongoing treatment for Ms. Harrison's neck since March 8, 2022 that would support

the surgery recommendation, and, if there was no ongoing treatment, the reason for the

lack of treatment.  *Id.*  State Farm stated that, once it received that information, it would

be able to complete its evaluation and provide a response.  *Id.*  On November 2, 2024,

Ms. Harrison's attorney emailed the surgeon's quote, explained that Ms. Harrison was

continuing to treat her neck, and stated that those records would be forwarded upon

receipt.  *Id.* at 9, ¶ 50.

On November 4, 2022, State Farm issued a payment of $22,903.29 for Ms. Harrison's undisputed past medical expenses.  *Id.*, ¶ 51.  On December 13, 2022, Ms. Harrison's attorney asked State Farm what the payment was for, a breakdown of the new evaluation, and an explanation as to why the cost of surgery was not included.  *Id.*, ¶ 52.

On December 29, 2022, State Farm responded that there was an outstanding question as to the neck surgery, given that State Farm did not have records for any treatment for the neck since March 8, 2022.  *Id.*, ¶ 53.  State Farm asked if Ms. Harrison had sought any further treatment for the neck since that date and, if not, the reason for stopping treatment.  *Id.*  State Farm also extended a new offer of $54,650.51.  *Id.*  On January 16, 2023, Ms. Harrison's attorney enclosed additional medical records and bills.  *Id.*, ¶ 54.  Per the letter, Ms. Harrison's past medical expenses totaled $61,351.31.  *Id.*  Ms. Harrison requested any benefits owed at that time.  *Id.*  On February 1, 2023, Ms. Harrison's attorney responded to State Farm's December 29, 2022 letter.  *Id.*, ¶ 55.  Her attorney explained that Ms. Harrison continued to treat for neck pain, back pain, and traumatic brain injury.  *Id.*  The attorney further explained that Ms. Harrison did not seek treatment for her neck from March 2022 through August 22, 2022 due to other health issues.  *Id.*  The attorney stated that a surgeon at Denver Health had recently deemed Ms. Harrison not to be a surgical candidate due to bone density issues.  *Id.*  The attorney stated that those records would be sent to State Farm upon receipt.  *Id.*  On February 7, 2023, Ms. Harrison's attorney sent a letter to State Farm indicating that bills from Denver Health were pending.  *Id.* at 10, ¶ 56.

On February 24, 2023, State Farm sent a letter to Ms. Harrison's attorney stating that its file showed no neck treatment from December 20, 2021 until August 9, 2022. *Id.*, ¶ 57.  State Farm stated that, due to the gaps in treatment, it still questioned the need for the surgery and requested an IME.  *Id.*  On February 24, 2023, State Farm sent a letter to ExamWorks[8] requesting a records review and a physical examination. *Id.*, ¶ 58.  On March 9, 2023, State Farm received an email from ExamWorks that Ms. Harrison's IME was set for April 6, 2023 with N. Neil Brown, MD.  *Id.*, ¶ 59.  On March 15, 2023, Ms. Harrison's attorney disputed the gap in care from December 2021 through August 2022 and stated that those records had been sent to State Farm.  *Id.*, ¶ 60.  Her attorney also stated that Dr. Brown was biased but that Ms. Harrison understood State Farm's contractual right to request an IME by a doctor of its choosing. *Id.*  The attorney stated that, if State Farm wanted to discuss other nonbiased doctors, Ms. Harrison would be happy to collaborate.  *Id.*

On March 15, 2023, State Farm responded to the March 15, 2023 letter.  *Id.*, ¶ 61.  State Farm stated that, regarding the gap in care, no records had been attached to Ms. Harrison's letter.  *Id.*  State Farm asked Ms. Harrison to send the records and bills for the IME provider's review.  *Id.*  State Farm further stated that it did not choose the IME provider and that any concerns or changes should be raised with the vendor. *Id.*  On March 21, 2023, State Farm emailed Ms. Harrison's attorney, requesting the reasons for counsel's claim that Dr. Brown was biased and the request for a new

---

[8] Although not included in the parties' undisputed facts, Exam Works, LLC appears to be a "provider of independent medical examinations, peer reviews, bill reviews, Medicare compliance, record retrieval, document management and related services."  *About ExamWorks*, ExamWorks, https://www.examworks.com/about/about-examworks (last visited Sept. 25, 2025).

provider.  *Id.*, ¶ 62.  State Farm stated that, otherwise, it was going to proceed with the IME with Dr. Brown.  *Id.*

On April 6, 2023, Ms. Harrison's IME with Dr. Brown took place.  *Id.* at 11, ¶ 63. In his IME report, Dr. Brown opined that: Ms. Harrison's lumbar symptoms were not related to the accident, *id.*, ¶ 64; that Ms. Harrison suffered a cervical whiplash injury, Docket No. 62 at 6, ¶ 16; that cervical whiplash syndrome can be chronic in nature, *id.* at 7, ¶ 26; that all of Ms. Harrison's neck treatment to date was caused by the collision, *id.* at 6, ¶ 13; that the treatment Ms. Harrison sought was reasonable, necessary, and appropriate, *id.*, ¶ 23; that, while she was not a candidate for cervical surgery, Ms. Harrison may benefit from cervical injections, Docket No. 55 at 11, ¶ 63;[9] that Ms. Harrison may benefit from diagnostic medial branch blocks in her cervical spine, Docket No. 62 at 6, ¶ 24; and that, if diagnostic, she would be a candidate for radiofrequency ablations of the appropriate medial branches.  *Id.*

On May 10, 2023, State Farm sent a letter to Ms. Harrison's attorney stating that it had completed its evaluation.  Docket No. 55 at 11, ¶ 65.  After reviewing Dr. Brown's IME report, State Farm did not consider future medical expenses for the neck surgery. *Id.*  State Farm's offer to settle Ms. Harrison's UIM claim remained at $54,650.51.  *Id.*

---

[9] Ms. Harrison disputes this fact, stating that, "[d]efendant State Farm is not providing the full context of Dr. Brown's report, especially that Dr. Brown indicated that all of Ms. Harrison's injuries were related, and that Ms. Harrison is a candidate for cervical medial branch blocks and radiofrequency ablations which were not considered in State Farm's evaluation."  Docket No. 62 at 3-4, ¶ 64.  The Court has reviewed the underlying record that State Farm cites and finds that State Farm has accurately characterized the doctor's report.  *See* Docket No. 55-46 at 2-3.  The Court deems this fact to be admitted.

State Farm stated that it was open to new information.  *Id.*[10]  On May 16, 2023, Ms.

Harrison's attorney disputed State Farm's claim that it had little control over the IME

provider.  *Id.*, ¶ 66.  Her attorney asked why State Farm's offer did not include possible

future injections as indicated in Dr. Brown's IME report.  *Id.*  The attorney also disputed

Dr. Brown's medical opinions and his qualifications, asked whether State Farm

considered all of Ms. Harrison's past medical bills, and asked how State Farm

apportioned non-economic damages and impairment in its evaluation.  *Id.*

In an email to Ms. Harrison's attorney dated June 5, 2023, State Farm stated:

that it did not have any input in the assignment of Dr. Brown, *id.*, ¶ 67; that it would

consider future injections if Ms. Harrison was interested in pursuing them and asked

what future treatment Ms. Harrison planned to engage in, *id.*; that it could not speak to

any medical decisions made by Dr. Brown, *id.*; and that it considered Ms. Harrison's

medical bills in full and considered all impairment and noneconomic damages as one

amount, in a range.  *Id.*  This email never left State Farm's email servers and was never

received by Ms. Harrison's attorney.  Docket No. 69 at 7-8, ¶ 12.[11]  In response to

---

[10] Ms. Harrison disputes this fact, stating that, "State Farm had already
completed its evaluation before the IME and the IME did not change State Farm's
evaluation.  Despite Dr. Brown's opinions and recommendations, State Farm refused to
pay for the future treatment for Ms. Harrison."  Docket No. 62 at 4, ¶ 65.  Ms. Harrison's
objection appears to take issue with the fact that State Farm's evaluation did not
incorporate the doctor's recommendation for cervical injections.  That issue has no
bearing on State Farm's proffered fact that it sent a letter stating that it had completed
its evaluation and that it did not consider future expenses for neck surgery.  The Court
deems this fact to be admitted.

[11] A discovery dispute was ongoing at the same time as the briefing on the
motion for summary judgment.  *See* Docket No. 61; Docket No. 64-1.  On October 9,
2024, in between the filing of Ms. Harrison's response brief and the filing of State
Farm's reply brief, the parties reached a stipulation regarding the issue of these emails.
Docket No. 64 at 1.  Specifically, State Farm stipulated that "the e-mails in question
never left the State Farm servers and would not have been received and were not

follow-up inquiries by Ms. Harrison's attorney, State Farm attempted to re-send its June 5, 2023 email on June 23, 2023 and on August 8, 2023.  Docket No. 55 at 12, ¶¶ 68-69. Once again, these emails did not leave State Farm's email servers and were not received by Ms. Harrison's attorney.  Docket No. 69 at 7-8, ¶ 12.  State Farm never considered future damages for Ms. Harrison.[12]  Docket No. 62 at 6, ¶ 15.

Ms. Harrison filed her complaint against State Farm on September 7, 2023. Docket No. 55 at 12, ¶ 70.

## II. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  A disputed fact is "material" if,

---

received by Plaintiff's counsel."  *Id.*  This stipulation is also reflected in the final pretrial order.  *See* Docket No. 69 at 7-8, ¶ 12.  Moreover, in its reply, State Farm states that it "admits that the three emails dated June 5, 2023, June 23, 2023 and August 8, 2023 never left State Farm's servers and were never received by Plaintiff's counsel."  Docket No. 66 at 2, ¶¶ 67-69.  Therefore, the fact that June 5, 2023, June 23, 2023, and August 8, 2023 emails never left State Farm's servers is undisputed.  Although a party may not normally raises issues of fact for the first time in its reply brief, because the fact at issue is not in disputed and that it is relevant to the court's resolution of the motion for summary judgment, the Court will consider the fact that certain emails from State Farm to Ms. Harrison's attorney did not leave State Farm's server.

[12] In her statement of additional disputed facts, Ms. Harrison states that "[d]espite Dr. Brown's Opinion, State Farm never considered future treatment or other future damages for Ms. Harrison."  Docket No. 62 at 6, ¶ 15.  State Farm denies this fact on the basis that State Farm attempted to send an email to Ms. Harrison in which State Farm agreed to consider future treatment.  *See* Docket No. 66 at 3, ¶ 15.  State Farm does not respond to Ms. Harrison's assertion that State Farm did not consider future damages.  Moreover, Ms. Harrison cites an Auto Injury Evaluation, in which State Farm evaluates the value of Ms. Harrison's claim.  Docket No. 62-6 at 1.  In the Current Evaluation Range of Damages section, State Farm values Ms. Harrison's "Future Wage Loss" and "Future Pain/Suffering" at zero dollars.  *Id.* at 7.  Therefore, Ms. Harrison has supported her assertion that State Farm did not consider future damages when evaluating Ms. Harrison's claim.

under the relevant substantive law, it is essential to proper disposition of the claim.

*Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes

over material facts can create a genuine issue for trial and preclude summary judgment.

*Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is

"genuine" if the evidence is such that it might lead a reasonable jury to return a verdict

for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

Where "the moving party does not bear the ultimate burden of persuasion at trial,

it may satisfy its burden at the summary judgment stage by identifying a lack of

evidence for the nonmovant on an essential element of the nonmovant's claim."

*Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quotations

omitted).  "Once the moving party meets this burden, the burden shifts to the nonmoving

party to demonstrate a genuine issue for trial on a material matter."  *Concrete Works of*

*Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994).  The

nonmoving party may not rest solely on the allegations in the pleadings, but instead

must designate "specific facts showing that there is a genuine issue for trial."  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quotations omitted).  "To avoid summary

judgment, the nonmovant must establish, at a minimum, an inference of the presence of

each element essential to the case."  *Bausman*, 252 F.3d at 1115.  When reviewing a

motion for summary judgment, a court must view the evidence in the light most

favorable to the non-moving party.  *Id.*

## III. ANALYSIS

State Farm seeks partial summary judgment on the breach of contract claim and

summary judgment on both of the claims for bad faith delay or denial of insurance

benefits.  Docket No. 55 at 1.

### A. <u>Common Law Marriage</u>

State Farm seeks partial summary judgment on Ms. Harrison's breach of contract claim. *Id*. at 13-16. State Farm explains that, if Ms. Harrison and Mr. Spotts were legally married at the time of the accident, Ms. Harrison would be covered by the underinsured motorist ("UIM") provisions of four different insurance policies held by Mr. Spotts. *Id*. The policies would apply to Ms. Harrison because those policies apply to Mr. Spotts, as the policyholder, and to any "resident relatives" of Mr. Spotts, including his spouse. *Id*. If all four policies apply to Ms. Harrison as the spouse of Mr. Spotts, then she would have $400,000 in UIM coverage available to her. *Id*. at 14. If Ms. Harrison and Mr. Spotts were not married at the time of the accident, then Ms. Harrison was insured for UIM coverage only as "'any other person while occupying a vehicle owned by' Mr. Spotts 'only under one policy providing the single highest applicable limit of [UIM] coverage if there is more than one such policy issued by' State Farm." *Id*. In that scenario, only $100,000 in UIM coverage would be available. *Id*. State Farm argues that Ms. Harrison and Mr. Spotts were not common law married under Colorado law and, because of that, seeks summary judgment regarding the amount of UIM coverage applicable to Ms. Harrison. *Id.* at 14-16. Ms. Harrison argues that she and Mr. Spotts were common law married at the time of the accident, and that there is sufficient evidence to create a genuine dispute of material fact as to whether they were married and thus whether she is entitled to a greater amount of UIM coverage. Docket No. 62 at 13-14.

Colorado is one of only ten states that still allow the formation of common law marriages. *Hogsett v. Neale*, 478 P.3d 713, 720 (Colo. 2021). Unlike a formal, licensed marriage, which involves fulfilling certain statutory requirements, a couple enters a

common law marriage through "mutual agreement of the parties followed by assumption

of a marital relationship." *Id.* at 719 (citation omitted). In a 1987 opinion, the Colorado

Supreme Court listed factors for courts to consider when assessing whether a common

law marriage exists. *See People v. Lucero*, 747 P.2d 660, 665 (Colo. 1987). In *Lucero*,

the court wrote that:

> The two factors that most clearly show an intention to be married are cohabitation and a general understanding or reputation among persons in the community in which the couple lives that the parties hold themselves out as husband and wife. Specific behavior that may be considered includes maintenance of joint banking and credit accounts; purchase and joint ownership of property; the use of the man's surname by the woman; the use of the man's surname by children born to the parties; and the filing of joint tax returns. *See* Mills, *Common Law Marriage in Colorado*, 16 Colo. Law. 252, 257 (1987). However, there is no single form that any such evidence must take. Rather, any form of evidence that openly manifests the intention of the parties that their relationship is that of husband and wife will provide the requisite proof from which the existence of their mutual understanding can be inferred.

*Id.*

In a 2021 opinion, the Colorado Supreme Court updated the framework from

*Lucero* in order to address two perceived issues: first, that *Lucero* is underinclusive of

common law same-sex marriages and, second, that the *Lucero* factors "no longer mark

a reliable boundary between marital and nonmarital unions." *Hogsett*, 478 P.3d at 721-

22. The court described the appropriate analysis as follows:

> In assessing whether a common law marriage has been established, courts should give weight to evidence reflecting a couple's express agreement to marry. In the absence of such evidence, the parties' agreement to enter a marital relationship may be inferred from their conduct. When examining the parties' conduct, the factors identified in *Lucero* can still be relevant to the inquiry, but they must be assessed in context; the inferences to be drawn from the parties' conduct may vary depending on the circumstances. Finally, the manifestation of the parties' agreement to marry need not take a particular form.

*Id.* at 724.  The court further explained that the analysis a court engages in should be a "flexible inquiry into the totality of the circumstances that relies on the factfinder's credibility determinations and weighing of the evidence," and that "a mutual agreement to marry does not alone suffice; there must be some evidence of subsequent conduct manifesting that agreement."  *Id.*  Finally, after noting that the *Lucero* factors, when stripped of their heteronormative terminology, still carried some potential value in the analysis, the Colorado Supreme Court directed courts to consider:

> [E]vidence of shared financial responsibility, such as leases in both partners' names, joint bills, or other payment records; evidence of joint estate planning, including wills, powers of attorney, beneficiary and emergency contact designations; and symbols of commitment, such as ceremonies, anniversaries, cards, gifts, and the couple's references to or labels for one another.  Courts should also consider the parties' sincerely held beliefs regarding the institution of marriage.

*Id.* at 725.

The Court finds that Ms. Harrison and Mr. Spotts are not common law married because the evidence does not show that they "mutually intended to enter a *marital* relationship – that is, to share a life together as spouses in a committed, intimate relationship of mutual support and mutual obligation."  *Hogsett*, 478 P.3d at 724.[13] There are no undisputed facts that Ms. Harrison and Mr. Spotts had an express

---

[13] As a preliminary matter, the Court finds that the issue of whether Ms. Harrison and Mr. Spotts are common law married is a legal issue for the Court to decide.  *See e.g.*, *Hogsett*, 478 P.3d at 716; *Lucero*, 747 F.2d at 661-62.  In a few Colorado cases, courts have treated the existence of a common law marriage as a question of fact to be determined by a jury.  *See Williams v. Am. Family Mutual Ins. Co.*, No. 18-cv-00621-CMA-NRN, 2019 WL 2357317, at *6 (D. Colo. June 4, 2019); *Pertile v. General Motors, LLC*, No. 15-cv-0518-WJM-NYW, 2017 WL 2559218, at *4 (D. Colo. June 13, 2017); *Whitenhill v. Kaiser Permanente*, 940 P.2d 1129, 1132 (Colo. Ct. App. 1997).  However, these cases were decided prior to *Hogsett*.

agreement to marry.[14]  Mr. Spotts "guessed" that the couple married in 1991, but could

not recall the day or month.  Docket No. 55 at 4, ¶ 14.  There was never a formal

---

[14] In Ms. Harrison's deposition, in response to the question "[y]ou are not married
to Mr. Spotts, are you?" Ms. Harrison responded, "[w]e're common law."  Docket No. 62-
1 at 4, 30:17-19.  Ms. Harrison also submitted declarations on behalf of herself and Mr.
Spotts, in which they both state that they are common law married to each other.  *See*
Docket No. 62-3 at 1, ¶ 2 ("I am common-law married to Mr. Ronnie Spotts"); Docket
No. 62-4 at 1, ¶ 2 ("I am common-law married to Ms. Gail Harrison").  Ms. Harrison's
and Mr. Spotts's statement that they are common law married are insufficient to create
a dispute of material fact on this issue.  As noted earlier, whether Ms. Harrison and Mr.
Spotts are common law married is legal determination for the court to decide.  "[L]egal
conclusions, opinions, self-serving or conclusory statements, and statements that are
not supported by any corroborating evidence" do not suffice as sufficient evidence at the
summary judgment stage.  *Curtis v. State Farm Mut. Auto. Ins. Co.,* 621 F. Supp. 2d
1122, 1126 (D. Colo. 2008).  During their depositions, Ms. Harrison and Mr. Spotts
testified that they signed a document provided by Mr. Spotts's union indicating that they
were common law married.  Docket No. 62-1 at 5, 42:15-25; Docket No. 62-2 at 5,
25:17-24.  Ms. Harrison attaches a copy of the document she describes as a "Union
Common-Law Document."  Docket No. 62 at 3, ¶ 10 (citing Docket No. 62-20).  The first
page of the document, which bears the heading "Consequences of Common Law
Marriage," describes the institution of common law marriage, indicating that, "if you are
living with a member of the opposite sex with the present intent to be married and if you
represent yourself to others as husband and wife, then the consequences of marriage
follows."  Docket No. 62-20 at 1.  The first page of the document has paragraphs
numbered "1" to "3."  *Id.*  The bottom half of the first page is blank, suggesting that it has
been redacted.  *Id.*  The second page of the exhibit is typed in a different font than the
first page, which strongly suggests that it is not part of the document that the first page
is part of.  *Id.* at 2.  The second page indicates that Ms. Harrison is Mr. Spott's spouse
and is purportedly signed by Mr. Spotts and Ms. Harrison.  *Id.*  Ms. Harrison does not,
however, provide any explanation of what this document is or why the first and second
pages do not match one another.  State Farm challenges the admissibility and
authenticity of the document.  Docket No. 66 at 5.  Ms. Harrison does not claim that the
"document" is self-authenticating.  Moreover, the exhibit is either an incomplete copy of
a document or is two different documents.  Ms. Harrison's and Mr. Spotts's testimony
does not lay a foundation for either the document's admissibility or its authenticity.
Therefore, the Court will not consider this document in resolving the motion for
summary judgment.  *See Johnson v. Weld Cnty., Colo.,* 594 F.3d 1202, 1210 (10th Cir.
2010) ("Material that is inadmissible will not be considered on a summary-judgment
motion because it would not establish a genuine issue of material fact if offered at trial."
(citation omitted)); *Fields v. Baseline Props., LLC,* 2020 WL 10790293, at *2 (W.D.
Okla. July 10, 2020) ("Unauthenticated documents, once challenged, cannot be
considered by a court in determining a summary judgment motion . . .  Documentary

ceremony, either in a church or with the government, and Mr. Spotts did not give Ms. Harrison a ring. *Id.*, ¶ 13.

Because there is no evidence of an express agreement to marry, the Court turns to evidence of Ms. Harrison and Mr. Spotts's conduct to determine if such an agreement may be inferred. *See Hogsett*, 478 P.3d at 726. Ms. Harrison and Mr. Spotts do not celebrate any anniversary. Docket No. 55 at 4, ¶ 15. As already noted, there was never a formal ceremony, either in a church or with the government. *Id.*, ¶ 13. Mr. Spotts did not give Ms. Harrison a ring. *Id.* Ms. Harrison claims she told one person that she was common law married, while Mr. Spotts has not told anyone, including his two children with whom he keeps in touch, that he was common law married. *Id.*, ¶ 9. The parties have never owned any property or real estate together, *id.*, ¶ 11, nor have they owned any financial accounts, bank accounts, or loans together. *Id.*, ¶ 12. Ms. Harrison and Mr. Spotts have never filed joint taxes. *Id.* at 3, ¶ 5. They receive social security benefits as single. *Id.* at 4, ¶ 8. Ms. Harrison applied to Medicaid and Medicare as single, and Mr. Spotts applied to Medicare as single. *Id.* at 3, ¶ 7. Mr. Spotts filed for bankruptcy as single in 1997.[15] *Id.*, ¶ 6. Thus, there is no indication that Ms. Harrison or Mr. Spotts presented themselves to the world as married. Furthermore, "there is no evidence that the parties chose to hide the true nature of their relationship for fear of disapproval or discrimination," which was an animating concern in *Hogsett*'s

---

evidence for which a proper foundation has not been laid cannot support a summary judgment motion.").

[15] In signing the bankruptcy filing, Mr. Spotts "declare[d] under penalty of perjury that the information provided in this petition is true and correct." Docket No. 55-3 at 2.

decision to refine *Lucero*'s test for common law marriage. *See Hogsett*, 478 P.3d at 726.

The fact that Ms. Harrison and Mr. Spotts divide household expenses, such that Mr. Spotts pays for vehicles and insurance, while Ms. Harrison pays for television, internet, and groceries, Docket No. 62 at 5, ¶¶ 3-6, is not indicative of a common law marriage under *Lucero*, which considers shared, rather than divided, financial responsibilities. *See Lucero*, 747 P.2d at 665. Furthermore, in *Hogsett*, the Colorado Supreme Court "recognized that cohabitation is no longer synonymous with marriage." 478 P.3d at 722. And *Hogsett* noted that financial arrangements – even where the parties have joint banking and credit accounts, which is not the case here – are no longer reliable indicators of a marital relationship in the modern age. *See id.* at 726. The fact that Ms. Harrison and Mr. Spotts share responsibility for a dog is not persuasive evidence that the two are common law married, given that many cohabitating couples share responsibility for pets. Finally, the fact that Mr. Spotts, on his bankruptcy petition, stated that he was single and signed the petition under penalty of perjury is strong evidence that his representation was true. Accordingly, the Court finds that, "[c]onsidering the totality of the circumstances and viewing the evidence in context," there was no mutual agreement between Ms. Harrison and Mr. Spotts to marry. *See id.* (holding that the parties did not mutually agree to marriage where "they never celebrated the date of the ring exchange as an anniversary," "did not wear their rings consistently," "never privately celebrated the ring exchange as a key date in their relationship," and "in communications with third parties, including family and long-time friends" only one party referred to the other as her "wife" and "described the relationship

19

as a marriage"). Based on the undisputed facts, the Court finds that Ms. Harrison and Mr. Spotts are not common law married.[16]  Because the Court finds that Ms. Harrison and Mr. Spotts are not common law married, the Court will grant State Farm's partial motion for summary judgment on that issue.

### B. Statutory Bad Faith Claim

Ms. Harrison brings a claim under Colo. Rev. Stat. § 10-3-1116 for unreasonable denial and delay of benefits. Docket No. 11 at 10, ¶¶ 119-22. Section 10-3-1116(a) provides that people who suffer an unreasonable delay or denial of benefits, as defined in Colo. Rev. Stat. § 10-3-1115, may bring an action for attorneys' fees and twice the covered benefit. *See* Colo. Rev. Stat. § 10-3-1116. Pursuant to § 10-3-1115, an insurer may not "unreasonably delay or deny payment of a claim for benefits owed to or on behalf of any first-party claimant." Colo. Rev. Stat. § 10-3-1115(1)(a). An insurer's conduct is unreasonable "if the insurer delayed or denied authorizing payment of a covered benefit without a reasonable basis for that action." Colo. Rev. Stat. § 10-3-1115(2). The determination of whether an insurer has breached its duties to the insured is one of reasonableness under the circumstances. *Estate of Morris v. COPIC Ins. Co.*, 192 P.3d 519, 523 (Colo. App. 2008). In Colorado, acting "without a reasonable basis" has been construed to mean pursuing a groundless position that is not supported by credible evidence. *Cooper v. Shelter Gen. Ins. Co.*, 653 F. Supp. 3d 873, 878 (D. Colo. 2023) (quoting *Masters v. Safeco Ins. Co. of Am.*, No. 20-cv-00631-PAB-NRN, 2021 WL 4326269, at *5 (D. Colo. Sept. 23, 2021)). The question is whether a reasonable

---

[16] Even if the Court were to determine that the common law marriage issue should be tried to a jury, in light of the undisputed facts, the Court finds that no reasonable juror could conclude that Ms. Harrison and Mr. Spotts are common law married.

insurer under similar circumstances would have denied or delayed payment of the

claim. *Estate of Morris*, 192 P.3d at 523. The reasonableness of an insurer's conduct

must be determined objectively, based on proof of industry standards. *Schultz v.*

*GEICO Cas. Co.,* 429 P.3d 844, 847 (Colo. 2018). Whether an insurer's conduct was

reasonable under the circumstances is ordinarily a question of fact for the jury. *Zolman*

*v. Pinnacol Assurance*, 261 P.3d 490, 497 (Colo. App. 2011). However, in appropriate

circumstances, as when there are no genuine disputes of material facts,

reasonableness may be decided as a matter of law. *Estate of Morris*, 192 P.3d at 524.

### 1. *Unreasonable Denial*

State Farm argues that Ms. Harrison has not created a dispute of material fact as

to whether it unreasonably denied her claim. Docket No. 55 at 17-18. State Farm

maintains that, under Colorado law, an "insured should not be allowed to automatically

accuse an insurer of bad faith in every situation in which the insurer disagrees with the

insured about the value of a claim." *Id.* at 18 (quoting *Sack v. Colo. Farm Bureau Ins.*

*Co.,* No. 20-cv-2580-WJM-NYW, 2021 WL 4991180, at *8 (D. Colo. Oct. 27, 2021)

(citation omitted)). It contends that, although Ms. Harrison disputes the value State

Farm gave her claim, she cites no facts that demonstrate that any denial by State Farm

of her claim was unreasonable. *Id.* Ms. Harrison responds that State Farm still has not

paid any benefits to Ms. Harrison for damages deemed reasonable by its independent

medical examiner. Docket No. 62 at 15.

First, to the extent that Ms. Harrison argues that she can demonstrate that State

Farm acted in bad faith based on conduct that occurred after Ms. Harrison filed suit, the

Court finds that State Farm's post-filing conduct is not a basis to deny State Farm's

motion for summary judgment. The scope of Ms. Harrison's claims is defined by her

21

complaint.  *Fuqua v. Lindsey Mgmt. Co.*, 321 F. App' x 732, 734 (10th Cir. 2009)

(unpublished) ("a claim or theory that is not adequately raised in the complaint will not

be considered").  Ms. Harrison has never amended her complaint.  Her complaint

alleges violations of § 10-3-1115 based on State Farm's conduct before September 7,

2023.  *See* Docket No. 11 at 1.  Courts in this district have held that "[n]ew theories of

liability are not appropriately raised for the first time in a summary judgment response"

and that "[a]ttempts to amend one's pleading through summary judgment briefing are

improper."  *Purser v. Gilliland*, No. 22-cv-02374-GPG-RTG, 2024 WL 5276679, at *12

(D. Colo. Nov. 21, 2024) (citing *Fuqua*, 321 F. App' x at 734); *Bedore v. Nationstar*

*Mortg. LLC.*, No. 22-cv-00179-SKC, 2024 WL 1555059, at *3 (D. Colo. Apr. 10, 2024)

("Plaintiff may not use his response to the Motion for Summary Judgment to add new

legal theories or claims he never asserted in his Complaint."), *aff'd*, 2024 WL 4432612

(10th Cir. Oct. 7, 2024); *Reyes v. Jensen*, No. 18-cv-03115-STV, 2020 WL 9719323, at

*8 (D. Colo. June 19, 2020) ("A claim not raised in the complaint, not to mention a claim

not raised in the original complaint or the first, second, or third amended complaints,

and initially asserted in a response to a summary judgment motion is not properly

before the court." (citations and internal quotation marks omitted))), *aff'd*, 2021 WL

2069699 (10th Cir. May 24, 2021).  Therefore, the fact that State Farm has "still not paid

any benefits to Ms. Harrison" is not a basis to deny State Farm's motion for summary

judgment.[17]  Docket No. 62 at 15.

---

[17] To the extent that Ms. Harrison claims that State Farm's May 10, 2023 denial of benefits to cover a cervical surgery constitutes bad faith because the denial was unreasonably delayed, the Court finds that Ms. Harrison has not created a dispute of material fact on this issue.  Rather, the undisputed facts show that State Farm's decision was made approximately a month after Dr. Brown completed his IME.  Docket

It is undisputed that State Farm denied coverage for a potential future cervical surgery.  *See* Docket No. 55 at 11, ¶ 65.  However, the only other facts regarding State Farm's denial of coverage for this surgery are that State Farm was informed on October 22, 2021 that Ms. Harrison had been recommended for cervical injections "and potentially, surgery," *id.* at 6, ¶ 27; that, as of February 1, 2023, Ms. Harrison's doctor indicated that Ms. Harrison was not a surgical candidate due to bone density issues, *id.* at 9, ¶ 55; and that Dr. Brown concluded that Ms. Harrison was not a candidate for the cervical surgery after conducting an IME.  *Id.* at 11, ¶ 65.  Given that Ms. Harrison's doctor and Dr. Brown both later concluded that Ms. Harrison was not a candidate for surgery, State Farm's denial was not a groundless position unsupported by credible evidence.  *Cooper*, 653 F. Supp. 3d at 878.  Ms. Harrison has failed to create a dispute of material fact as to whether it was unreasonable for State Farm to deny Ms. Harrison's claim for future benefits to cover a potential cervical surgery.

### 2.  Unreasonable Delay

State Farm argues that no reasonable jury could find that it unreasonably delayed in paying Ms. Harrison's claim.  Docket No. 55 at 16.  State Farm asserts that

---

No. 55 at 11, ¶¶ 63-64.  For the reasons discussed below, the Court does not find that Dr. Brown's IME was conducted in bad faith.  Finally, the undisputed facts show that the delay between Ms. Harrison's attorney informing State Farm that she had been recommended "potentially" for surgery on October 22, 2021 and State Farm's May 10, 2023 denial was caused, in large part, by Ms. Harrison's delay in providing medical records.  Ms. Harrison delayed in providing medical records from November 20, 2021 to January 27, 2022 and from February 25, 2022 to August 15, 2022.  *Id.* at 6-8, ¶¶ 27, 32-48.  Moreover, the undisputed facts indicate that Ms. Harrison's attorney sent State Farm inaccessible medical records on August 15, 2022, which caused a further delay until October 7, 2022.  *Id.* at 11, ¶ 64.  Furthermore, it is undisputed that, although Ms. Harrison's counsel provided a signed ARI on October 22, 2021, Denver Health had a specialized ARI that was required for State Farm to access Ms. Harrison's medical records and that the ARI was sent to Ms. Harrison on July 6, 2022.  *Id.* at 6, 8, ¶¶ 27, 44.

the undisputed facts show that it did not delay paying any portion of the claim because State Farm promptly commenced its investigation into the matter, promptly provided consent for a settlement with the at-fault driver's insurer, and, accepting the representation that Ms. Harrison and Mr. Spotts were married, advised that four policies applied to the claim. *Id.* State Farm adds that it reviewed further documentation upon receipt, updated its evaluation, issued two undisputed payments, requested additional information, informed Ms. Harrison of the basis for its evaluations, and extended settlement offers. *Id.* State Farm notes that it believed it sent three emails to Ms. Harrison's attorney asking if Ms. Harrison was interested in injections or future treatment and that it was waiting for Ms. Harrison's response at the time that the suit was filed. *Id.* at 17. State Farm argues that there were no delays in resolving Ms. Harrison's claim and suggests that, to the extent that there was a delay, it was due to difficulties obtaining medical records – difficulties which plaintiff could have helped to mitigate. *Id.*

Ms. Harrison argues that she has put forward facts from which a jury could conclude that State Farm unreasonably delayed paying Ms. Harrison benefits because State Farm failed to conduct an appropriate investigation. Docket No. 62 at 15. Ms. Harrison asserts that State Farm "cherry-picked the records to find facts favorable to it." *Id.* In particular, she maintains that State Farm interpreted the record to find that there was a gap in treatment regarding Ms. Harrison's neck and back pain, "despite Ms. Harrison already being recommended a cervical surgery and injections." *Id.* Ms. Harrison appears to be arguing that it was unreasonable for State Farm to question whether she required surgery and to request an IME based on the fact that Ms. Harrison

did not receive treatment for her neck pain from December 20, 2021 until August 9, 2022.

The undisputed facts show that, on October 22, 2021, Ms. Harrison's attorney advised State Farm that she was continuing treatment and that she had been recommended for cervical injections and a potential surgery. Docket No. 55 at 6, ¶ 27. However, as of December 29, 2022, State Farm had not received medical records for Ms. Harrison that showed that she had continued treatment for her neck after March 8, 2022. *Id.* at 9, ¶ 53. On February 1, 2023, Ms. Harrison's attorney responded to State Farm's December 29, 2022 letter by explaining that Ms. Harrison did not seek treatment for her neck from March 2022 through August 22, 2022 due to other health issues and that a surgeon at Denver Health had recently deemed Ms. Harrison not to be a surgical candidate due to bone density issues. *Id.*, ¶ 55. On February 24, 2023, State Farm sent a letter to Ms. Harrison's attorney stating that it did not have medical records indicating that Ms. Harrison received treatment for her neck from December 20, 2021 until August 9, 2022 and that it was requesting an IME. *Id.* at 10, ¶ 57.

The Court finds that Ms. Harrison has failed to create a dispute of material fact as to whether the delay caused by State Farm requesting more information about Ms. Harrison's neck treatment or requesting an IME was unreasonable. First, Ms. Harrison provides no support for the proposition that it is unreasonable for an insurance company to question a recommendation for surgery or to request an IME.[18] The undisputed facts

---

[18] In fact, Ms. Harrison cites no facts, disputed or otherwise, regarding industry standards. *See* Docket No. 62. Instead, in a footnote in the introduction, Ms. Harrison references the expert report of Michael Rosenberg, which she claims "detail[s] State Farm's unreasonableness and violations of industry standards." Docket No. 62 at 2 n.1. In the argument section, Ms. Harrison states that she "has come forward with sufficient

show that Ms. Harrison's attorney acknowledged that State Farm had a contractual right

to request an IME.  *See id.*, ¶ 60.  Moreover,

> there is social utility in allowing no-fault insurance companies to request
> independent medical examinations performed by physicians of their choice.
> Insurance companies must be accorded wide latitude in their ability to investigate
> claims and to resist false or unfounded efforts to obtain funds not available under
> the contract of insurance.  Independent medical examinations at the insurance
> company's request allow it to make informed decisions about whether to deny
> benefits based on a physical or psychological condition.

*Martinez v. Lewis*, 942 P.2d 1219, 1224 (Colo. App. 1996), *aff'd*, 969 P.2d 213 (Colo.

1998) (citation, quotation, and alterations omitted).  Ms. Harrison includes no facts as to

what health conditions caused her to stop seeking treatment for her neck, why these

health conditions did not impact her need for the surgery, or why a recommendation for

surgery from October 22, 2021 would remain in effect on February 24, 2023.  Rather,

the undisputed facts show that counsel for Ms. Harrison informed State Farm that Ms.

Harrison was no longer a candidate for surgery.  Docket No. 55 at 9, ¶ 55.  The Court

finds that no reasonable juror could find that it was objectively unreasonable for State

Farm to ask why an injury sufficiently serious to merit surgery was not serious enough

to necessitate any interim treatment or delay payment of benefits for a potential future

surgery until after an IME.  As a result, Ms. Harrison fails to raise a genuine issue of

---

evidence of potential bad faith conduct to be evaluated by the jury" and includes a
general citation to the whole of Mr. Rosenberg's expert report.  *Id.* at 18.  Ms. Harrison
does not include any of Mr. Rosenberg's opinions in her statement of additional
disputed facts, and therefore the Court will not consider such opinions in resolving State
Farm's motion for summary judgment.  *See Gross v. Burggraf Const. Co.*, 53 F.3d
1531, 1546 (10th Cir. 1995) ("Without a specific reference, we will not search the record
in an effort to determine whether there exists dormant evidence which might require
submission of the case to a jury." (citation and quotation omitted)); *see also United
States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991).

material fact that State Farm conducted an inappropriate investigation that delayed

benefits due to Ms. Harrison.

Ms. Harrison argues that it was unreasonable for State Farm to request an IME

because State Farm had Ms. Harrison's medical records for the three years prior to the

accident.  Docket No. 62 at 15.  Ms. Harrison appears to argue that it was unnecessary

for Ms. Harrison to undergo an IME because State Farm already had sufficient medical

evidence to conclude that the collision caused Ms. Harrison's neck pain.  Ms. Harrison

provides no support for the proposition that an insurance company may not seek an

IME to address issues of causation when the temporal proximity of the accident to the

claimed injury alone indicates a causal connection.  There are no facts that demonstrate

that a different insurance provider reviewing Ms. Harrison's medical records would not

have also requested an IME.  *Estate of Morris*, 192 P.3d at 523.

Ms. Harrison argues that State Farm acted unreasonably by failing to consider

Dr. Brown's conclusions from the IME.  Docket No. 62 at 15.  Ms. Harrison maintains

that, after she "complied with the request, State Farm then failed to update its

evaluation despite Dr. Brown agreeing that all past treatment, the recommended

cervical injections, and visual therapy were reasonably related to the motor vehicle

crash."  *Id.*

It is undisputed that, on May 10, 2023, State Farm sent a letter to Ms. Harrison's

attorney stating that it had completed its evaluation; that, after reviewing Dr. Brown's

IME report, State Farm did not consider future medical expenses for the neck surgery;

and that State Farm's offer to settle Ms. Harrison's claim remained at $54,650.51.

Docket No. 55 at 11, ¶ 65.  On May 16, 2023, Ms. Harrison's attorney asked why State

Farm's offer did not include possible future injections as indicated in Dr. Brown's IME report.  *Id.*, ¶ 66.  On June 5, 2023, State Farm emailed Ms. Harrison's attorney, stating that it would consider future injections if Ms. Harrison was interested in pursuing them and asked what future treatment Ms. Harrison planned to engage in.  *Id.*, ¶ 67. Although Ms. Harrison denies that she ever received State Farm's email, Docket No. 62 at 4, ¶¶ 67-69, the parties have stipulated that State Farm sent the email, but that the email did not leave State Farm's servers.  Moreover, the parties have stipulated that, in response to follow-up inquiries by Ms. Harrison's attorney, State Farm attempted to re-send its June 5, 2023 email on June 23, 2023 and on August 8, 2023.  Docket No. 55 at 12, ¶¶ 68-69.

The Court finds that Ms. Harrison has failed to create a dispute of material fact as to whether State Farm unreasonably refused to consider Dr. Brown's recommendations for injections and future treatment.  Instead, State Farm attempted to communicate to Ms. Harrison that it would consider future injections and other treatments and attempted to inquire about Ms. Harrison's future treatment plans.  The reasonableness of an insurance company's conduct "must be evaluated based on the information before the insurer at the time of that decision."  *State Farm Mut. Auto. Ins. Co. v. Reyher*, 266 P.3d 383, 390 (Colo. 2011) (citation omitted).  There is no evidence indicating that State Farm was aware that the email stating that it would consider future medical care had not left its servers.  Moreover, after State Farm received follow-up inquiries from Ms. Harrison's attorney, State Farm attempted to send the email a second and third time. Thus, judged from State Farm's perspective based on the information available to it, State Farm did not refuse to consider Dr. Brown's recommendation for injection

treatment, and it was not unreasonable for State Farm to delay paying for other future

treatments until Ms. Harrison clarified what future treatment she intended to receive.

This case is therefore distinguishable from *Gardner v. State Farm Mut. Auto. Ins.
Co.*, 639 F. Supp. 3d 1158, 1167 (D. Colo. 2022), which Ms. Harrison cites. Docket No.
62 at 16. In *Gardner*, the court found that the failure to consider recommendations for
future treatment could constitute an unreasonable denial or delay of benefits. *Gardner*,
639 F. Supp. 3d at 1167. In that case, however, the defendant did not consider the
plaintiff's future medical needs. *See id.* at 1165. Here, State Farm's May 10, 2023
email stated that it was "open to new information." Docket No. 55 at 11, ¶ 65. The
parties do not dispute that State Farm, in response to Ms. Harrison's inquiry regarding
cervical injections, then attempted – albeit unsuccessfully – to obtain more information
from Ms. Harrison about her interest in the injections so that the cost could be
incorporated into the settlement offer. *Id.*, ¶ 67. Given these distinctions, the Court
finds that *Gardner* is not applicable to this case.

Ms. Harrison argues that "State Farm never considered future medical care, pain
and suffering, impairment, or any other class of damages in its evaluation." Docket No.
62 at 16. It is not clear whether Ms. Harrison's argument that State Farm did not
consider future damages is separate from her argument that State Farm failed to
consider future medical care. Although State Farm responds to Ms. Harrison's
argument that State Farm failed to consider Dr. Brown's recommendations for future
treatment, State Farm does not respond to Ms. Harrison's argument regarding its failure
to consider future pain and suffering. *See* Docket No. 66 at 7.

"UIM benefits are not limited to medical bills for past treatment, but can include payment for future medical expenses, lost wages, [and] emotional damages." *Gardner*, 639 F. Supp. 3d at 1165 (alterations omitted) (quoting *Vansky v. State Farm Auto. Ins. Co.*, No. 20-cv-01062-PAB-NRN, 2022 WL 900160, at *6 (D. Colo. Mar. 28, 2022)). It is undisputed that State Farm never considered Ms. Harrison's future damages. Docket No. 62 at 6, ¶ 15. However, Ms. Harrison fails to claim that her policy covers future damages for pain and suffering. As discussed above, Ms. Harrison does not identify and support the industry standard that she claims State Farm violated. For example, she provides no support for the proposition that it is an insurance industry standard in circumstances like this case for an insurance provider to include future pain and suffering as part of its evaluation. *See id.* at 15-16. Moreover, Ms. Harrison cites no facts that she ever requested coverage for damages for future pain and suffering or that State Farm ignored or denied such a request. Instead, the undisputed facts indicate that Ms. Harrison asked why the settlement offer did not include the cost of future injections. Docket No. 55 at 11, ¶ 66. Ms. Harrison cites no facts regarding what her future pain and suffering is likely to be or what information was provided to State Farm regarding these damages. She makes no argument as to why it was bad faith conduct for State Farm not to consider future pain and suffering, if any, based on the information available to it. Finally, as discussed above, it is undisputed that State Farm was awaiting more information about Ms. Harrison's proposed future treatment, which would have impacted whether and how much Ms. Harrison's future damages were likely to be. *Id.*, ¶¶ 65, 67. Accordingly, the Court finds that Ms. Harrison has not created a dispute of material fact as to whether State Farm's failure to consider future pain and suffering,

impairment, or any other class of future damages in its evaluation constituted bad faith under § 10-3-1115.  *See Vansky*, 2022 WL 900160, at *6 (finding that plaintiff had not shown a genuine dispute of material fact that defendant unreasonably delayed or denied his UIM claim because, "although plaintiff mentions continuing symptoms and future treatment, plaintiff provides no facts, disputed or undisputed, to support this claim").

### C. Common Law Bad Faith

To prevail on a claim for bad faith delay or denial of insurance benefits under Colorado common law, a plaintiff must establish that her insurer (1) acted unreasonably under the circumstances; and (2) knew of, or had reckless disregard for, the unreasonableness of its actions.  *Goodson v. Am. Standard Ins. Co. of Wisc.*, 89 P.3d 409, 415 (Colo. 2004).  "The only element at issue in the statutory claim is whether an insurer denied benefits without a reasonable basis."  *Cooper*, 653 F. Supp. 3d at 878 (alterations omitted) (quoting *Williams v. Owners Insurance Co.*, 621 F. App'x 914, 919 (10th Cir. 2015) (unpublished)).  "By contrast, to prove a first-party claim of common law bad faith, a plaintiff must show not only that the insurer's conduct in processing or denying a valid claim was unreasonable but also that the insurer knew its conduct was unreasonable or recklessly disregarded the unreasonableness of its conduct."  *Id.* (citing *Travelers Insurance Co. v. Savio*, 706 P.2d 1258, 1275–76 (Colo. 1985)).  "Accordingly, a claim of common law bad faith imposes a more exacting standard of proof than a statutory claim."  *Id.* (citation omitted)); *Kisselman v. Am. Family Mut. Ins. Co.*, 292 P.3d 964, 975 (Colo. App. 2011) (the "burden of proving th[e] statutory claim is less onerous than that required to prove a claim under the common law for breach of the duty of good faith and fair dealing").

31

State Farm argues that it is entitled to summary judgment on Ms. Harrison's common law bad faith claim because she "cannot identify any specific facts from which a rational factfinder could find in her favor, showing that State Farm acted in a knowingly or recklessly unreasonable manner." Docket No. 55 at 19. In response, Ms. Harrison raises several of the same arguments regarding the reasonableness of State Farm's conduct that the Court addressed in the previous section. *See*, *e.g.*, Docket No. 62 at 19 ("State Farm did not evaluate any future medical costs or future non-economic damages including impairment, pain and suffering, or inconvenience following receiving the report from Dr. Brown."). Ms. Harrison also argues that State Farm's conduct during the course of this litigation violated State Farm's common law duty of good faith and fair dealing by accusing Ms. Harrison of fraud for claiming to be married when she was not and by belatedly denying coverage ten months into this litigation. *Id.* at 18-19. For the reasons discussed above, the Court finds that State Farm's post-filing conduct is not a basis to deny summary judgment on Ms. Harrison's common law bad faith claim as alleged in the complaint.

Ms. Harrison argues that State Farm acted in bad faith because, "[o]nce it saw that Ms. Harrison needed addition[al] cervical spine treatment, its investigation focused on finding facts to support a denial of payment and was not a fair and unbiased effort to uncover relevant facts about the claim." *Id.* at 18. Moreover, Ms. Harrison claims that State Farm never attempted to discuss Ms. Harrison's injuries with her or her doctors. *Id.*

Ms. Harrison's assertions of fact supporting her bad faith claim are that Ms. Harrison was recommended for cervical surgery on December 1, 2021, *id.* at 5, ¶ 8, that

State Farm received five years of Ms. Harrison's medical records, *id.*, ¶ 9, that State Farm never spoke or attempted to speak with Ms. Harrison prior to May 10, 2024 regarding her injuries, *id.* at 8, ¶ 42, and that State Farm never spoke or attempted to speak with Ms. Harrison's physicians or treating providers regarding her injuries. *Id.*, ¶ 43.

These facts are insufficient to show that there is a dispute of material fact as to whether State Farm knew or recklessly disregarded the fact that its delay or denial of UIM benefits was unreasonable. First, Ms. Harrison provides no support for the proposition that it is an industry standard for insurance companies to interview the insured regarding their injuries or that failing to do so is bad faith conduct. *See Martin-Harker v. State Farm Mut. Auto. Ins. Co.*, No. 23-cv-00629-PAB-STV, 2025 WL 914297, at *8 (D. Colo. Mar. 26, 2025) (excluding expert opinion under Federal Rule of Evidence 702 because plaintiff's expert "offers no support for there being a 'proactive duty' to directly contact the insured and the insured's medical provider in situations, like here, where the insured is represented by counsel and the insurer has already obtained the medical documentation, or a large portion of it, from the insured" and noting that "[o]ther states recognize that there is no such duty for an insurer to contact the insured's medical provider or otherwise contact and obtain information from the insured directly where the insurer believes it already has the necessary information" (citing *Hanson v. State Farm Mut. Auto. Ins. Co.*, 261 F. Supp. 3d 1110, 1117 (W.D. Wash. 2017); *Jackson v. Allstate Ins. Co.*, 780 F. Supp. 2d 781, 792 (S.D. Ind. 2011); *State Farm Mut. Auto. Ins. Co. v. Misra*, 2024 WL 289032, at *3 (W.D. Tex. Jan. 25, 2024)). The undisputed facts show that State Farm was in regular communication with Ms.

Harrison's attorney since April 28, 2021, Docket No. 55 at 4, ¶ 17, and Ms. Harrison asserts that State Farm received five years of medical records.  Docket No. 62 at 5, ¶ 8. In light of the communications from her attorney and the submission of medical records, Ms. Harrison fails to explain why it was necessary for State Farm to speak with Ms. Harrison directly before May 10, 2024.

For the same reasons, Ms. Harrison has failed to show that State Farm's decision not to speak with Ms. Harrison's treating providers is bad faith conduct.  She provides no support for the proposition that it is an industry standard for insurance providers to speak directly with treating physicians.  *Cf. Martin-Harker*, 2025 WL 914297, at *8 (other courts have found that insurance providers have no duty to contact medical providers directly).  Moreover, Ms. Harrison asserts that State Farm was provided with five years of medical records, and she does not explain why further communication with her physicians was necessary.  *Id.*  Furthermore, it is undisputed that State Farm called Denver Health and faxed a request for records to Denver Health on May 11, 2022.  Docket No. 55 at 7, ¶ 39.  Finally, even if the Court were to assume that it was a breach of State Farm's duty of good faith and fair dealing not to communicate directly with Ms. Harrison or her treating physicians about her injuries, Ms. Harrison cites no facts that demonstrate that State Farm knew that it was engaging in bad faith conduct.

## IV.  CONCLUSION

It is therefore

**ORDERED** that State Farm's Opposed Motion for Partial Summary Judgment on Plaintiff's First Claim and Summary Judgment on Plaintiff's Second Claim and Third Claim for Relief [Docket No. 55] is **GRANTED**.  It is further

**ORDERED** that plaintiff's second and third claims are **DISMISSED with prejudice**.

DATED September 30, 2025.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge